## GIBSON et al. v. SHUTT.

No. 18337.   Opinion Filed June 26, 1928.

(Syllabus.)

**Bills and Notes—Action on Personal Notes of Bank Officers Reorganizing Bank Given to Depositor in Consideration of His Surrender of Certificates of Deposit—Failure of Defense.**

Where president, vice president and cashier of a failed bank, in their efforts to re-open or reorganize same, seek aid of one holding matured C. D.'s of said bank, who proposes by letter to such officers that he will surrender his C. D.'s and furnish additional money, provided such officers will execute their personal notes for the total amount, and where the letter contains the C. D.'s, check for the additional money, and the proposed notes, and where the offer is accepted, notes signed, cash received, C. D.'s taken over, which are later cashed and retired by defendants, and where the bank reorganizes under new name but with the same officers, and where, two years later, after several renewals of original notes, payee sues on said notes and the evidence relied upon by defense consists of statements of two defendants to the effect that they understood that the notes were given only as indemnity to payee against loss which might accrue to him upon his C. D.'s, it was not error for trial court to sustain a demurrer to defendant's evidence.

Commissioners' Opinion, Division No. 2.

Error from District Court, Grant County; James B. Cullison, Judge.

Action by J. O. Shutt against John J. Gibson, Charles D. Jackson, and J. A. Alderson for recovery on promissory note. Judgment for plaintiff upon demurrer to defendants' evidence in trial court. Appeal by defendants. Affirmed .

Drennan & Drennan and Sam P. Ridings, for plaintiffs in error.

P. C. Simons and Simons, McKnight, Simons & Smith, for defendant in error.

BENNETT, C.  J. O. Shutt brought action in district court of Grant county, Okla., against John J. Gibson, Charles D. Jackson, and J. A. Alderson to recover on a promissory note.  This note was dated January 20, 1925, and was for $3,000 payable August 15, 1925.  The petition was in usual form setting forth copy of note as exhibit "A" and alleging default in payment.  The defendants filed an original answer setting out a general denial, and as a second ground of defense alleging that on and prior to February 10, 1923, defendants were direcors of Farmers & Merchants Bank of Nash, Okla., on which date said bank suspended business, and that on February 20, 1923, plaintiff mailed to defendant J. A. Alderson a certain letter, made part of the answer and which is as follows:

"Lambert, Oklahoma.
"February 20, 1923.

"Mr. J. A. Alderson,
"Nash, Oklahoma.

"Dear Sir:

"Thinking perhaps you want to hear from me, in regard to these time deposits, that I have on your bank, first, there is $5,000 that will not be due for over five months yet, and will wave the privilege of using them before due.

"For the balance of my deposits in the bank I am enclosing two notes $3,000 each for the stockholders to jointly sign.  Now if this way meets with your approval have them sign them.  Then I will proceed to put enough more money in to cover these $6,000.-00 worth of notes.  Then I will deposit enough money in a new deposit for me to check from.

"Yours truly,
"J. O. Shutt."

That shortly thereafter plaintiff made a total deposit in said bank of $6,000, and that for the purpose of securing said Shutt against loss in leaving same in said bank, defendants executed two notes, one of which is the one in controversy.  That later Farmers & Merchants Bank was taken over by Farmers State Bank of Nash and under some agreement the same money was left in Farmers State Bank on time deposit and that said deposit having been renewed and paid until there now remains due to said J. O. Shutt on such time deposit only $3,-000, and that subsequently Farmers State Bank went into liquidation and that it is impossible to ascertain now what damage plaintiff will suffer.  Later this answer was amended so as to charge that the said certif-

icates of deposit were obtained by plaintiff through fraud and were not a proper charge against the bank, but were given to adjust a controversy between plaintiff and J. A. Alderson in which the bank was not interested;. and that the note sued on was given to secure plaintiff against loss that might accrue to him by leaving in said bank the proceeds of two certificates of deposit of said bank for $2.000 each, amounting, principal and interest, to $4,146, and the further sum of $1,853.50, aggregating $6,000, paid into the bank by plaintiff, and that said agreement was not to be operative unless said bank was reopened.

Said amended answer further shows that Farmers & Merchants Bank was reopened as Farmers State Bank of Nash, which latter bank was compelled to close its doors in September, 1925, and that it will pay a considerable percentage to its creditors upon liquidation, and until such liquidation they cannot tell how much they will be due plaintiff. A verified reply by way of general denial was filed by plaintiff. This denial also alleged that the brother of plaintiff was not his agent for any purpose other than to deliver the letter a copy of which is attached to defendants' answer.

Since defendants admitted the execution of note sued on, it was held that the burden was upon them.

After introduction of defendants' evidence there was a demurrer by plaintiff, upon consideration whereof the court sustained same and rendered judgment for note sued on, and from which judgment defendants appeal to this court for review.

The facts are, as shown by the record, that prior to giving of note sued on there existed at Nash, in Grant county, a bank known as Farmers & Merchants Bank of Nash and of which J. J. Gibson was president, J. A. Alderson was cashier, and Charles D. Jackson was vice president, all being directors of said bank. The bank suspended operations February 20, 1923. The note sued on was a renewal note, the original of which was executed February 21, 1923. just after Farmers & Merchants Bank had closed. At that time plaintiff held two certificates of deposit for $2,000 each. numbered 1010 and 1011, dated March 21, 1922, which were past due. and $5,000 in like certificates due in five months. The defendants, as officers and directors of the bank, were making every effort possible to reorganize the failed bank or to organize another bank under a new name to take over assets of the old bank

and pay the debts; and this course was pursued and the new bank was organized under name of Farmers State Bank of Nash. This bank took over the business of the old bank almost immediately following the giving of said notes to plaintiff.

The main difficulty in reorganization was that the bank was short of money, and defendants, who were also made officers in the new organization, wished plaintiff's assistance in reopening, and especially desired to arrange with him some plan to take care of his matured certificates of deposit and as well to secure additional cash with which to build up their money reserve. And it seems that he was willing to accommodate them, and, with that in mind, and for that purpose, addressed letter to them under date of February 20, 1923, which is made part of defendants' answer. In this letter plaintiff enclosed the two overdue certificates of deposit, which had accrued interest thereon of $146.50; also a certificate of deposit on Alfalfa County National Bank for $1,000 on which there was accrued interest amounting to $76.67; also his personal check to Farmers & Merchants Bank for $1,853.-51. This certificate of deposit on Alfalfa County National Bank was to be deposited to plaintiff's credit in Farmers State Bank of Nash and added to his account there out of which his check for $1,853.51 would be paid and was paid, so that the consideration of the two original notes for $3,000 each consisted of the following items:

Certificates of deposit Nos. 1010 and
    1011 _____$4,000.00
Accrued interest thereon _____   146.50
Personal check of plaintiff for ____. 1,853.50

Defendants offered in evidence the two certificates of deposit referred to as Nos. 1010 and 1011, and they are stamped "Paid" by Farmers & Merchants Bank of Nash on August 10, 1923, and the certificate of deposit register of the bank was also offered by defendants in evidence showing these to have been paid on September 4, 1923, that is, the entry was evidently not made on the register until some time after they were stamped "Paid."

The foregoing facts are practically agreed on by the respective parties hereto and the only point of difference appears to be that defendants claim and introduce evidence to show that the promissory note herein sued on and the one of like amount not matured at the time of this suit were executed and delivered by defendants to plaintiff as se-

curity or to indemnify him against loss on his certificates of deposit Nos. 1010 and 1011. It is the contention of plaintiff, on the other hand, that he agreed to surrender and did surrender up the certificates of deposit to defendants, which were thereafter paid and extinguished, and that he also paid to said defendants or to their bank the exact amount of difference between said certificates of deposit plus the added interest accrued thereon and the $6,000 which by his letter he had agreed to advance and which was the exact face value of the notes of said officers.

The following may be taken as a fair summary of the evidence:

Charles D. Jackson, witness for defendants, testified that he lived a mile south of Nash since 1895; connected with the Farmers & Merchants Bank as a director and vice president; that he had served in capacity of director practically all the time and as vice president during 1921, 1922, and 1923, and until the institution closed; that codefendant Gibson was president and that codefendant Alderson was cashier, and that the note sued on is the renewal of one of the notes executed by defendants February 20, 1923, ten days after bank closed; that Alderson explained to him the purpose for which the notes were to be executed and that he thereafter executed renewals of the same, the one in suit being one of the last renewals. He says that the two $3,000 notes were executed at the same time and by the same parties, Jackson, Alderson and Gibson. The two first original notes were signed at the bank in Nash. Witness says he saw the letter which accompanied the notes—the original notes that were first signed. This letter was from Mr. Shutt, the plaintiff, and had been brought to defendants by D. B. Shutt, a brother of plaintiff. Witness did not see the two certificates of deposit; only saw the notes; that Alderson told witness the notes were guarantee for Shutt. Did not at that time know that Shutt was turning in the two certificates of deposit. It was the understanding the notes were to guarantee him against loss on $6,000 worth of C. D.'s. Witness did not see check for $1,850 that plaintiff sent; did not see certificate of deposit for $1,000 on Alfalfa County Bank. Never learned that he had turned in a certificate of deposit on Alfalfa County Bank until this suit was brought; it appears now to have been turned in. Witness knows now that at the same time plaintiff

sent letter by D. B. Shutt to the bank, that he sent in two certificates of deposit for $2,000 each and that he also sent in a certificate of deposit on Alfalfa County Bank to be deposited to his credit. Witness has also learned since suit began that plaintiff sent in his check for $1,853.50 payable to Farmers & Merchants Bank. Witness says that he understood that he, in signing the $3,000 notes, was just guaranteeing payment of C. D.'s.

"Q. You understood there was a purpose in executing those notes making you men liable to Mr. Shutt? A. Yes, I guess, something would happen to them C. D.'s if the bank should reopen. Q. The bank did re-open, didn't it? A. Yes, sir. Q. At the time you signed those original notes you were a director in that bank? A. Yes, sir. Q. You were vice president of that bank? A. Yes, sir. Q. Gibson was president and Alderson was cashier? A. Yes, sir. Q. You were very anxious at that time to get things shaped up so the bank could reorganize? A. Yes, we was anxious to get it open. Q. You wanted to fix it so no demand would be made for payment on those C. D.'s didn't you? A. I don't understand. Q. You wanted to make arrangements with Mr. Shutt so that he wouldn't demand payment on those $4,000 worth of C. D.'s? A. Yes, that was the understanding. Q. You gave those notes to Mr. Shutt to keep him from demanding payment on his C. D.'s, didn't you? A. Yes, sir. T. Then, later on, the bank did reopen? A. Yes, sir. Q. You afterward renewed those two notes, didn't you? A. Yes, sir. Q. When was that, the first renewal? A. I don't know just when the first renewal was. Q. That was part of the same transaction to prevent Mr. Shutt from demanding payment of his C. D.'s? A. Yes, sir."

Witness says that he gave two renewal notes for the same amount, $3,000 each, and he identifies note sued on herein as dated January 20, 1925, and says that he signed same, and also the one for same amount and of same date due December 15, 1925. Witness says these are the last renewals of the original notes. At date of final renewals the bank was still operating; that the new bank had been organized as Farmers State Bank and witness was director of new bank; J. J. Gibson was president and J. A. Alderson was cashier. The reorganized bank had taken over obligations of Farmers & Merchants Bank, including C. D.'s of Mr. Shutt, but witness says he does not know how they were handled afterwards, nor when they were paid and charged off. Witness is shown the two C. D.'s issued to plaintiff for $2,000 each and says they are

marked "Paid" August 10, 1923, but witness does not know anything of the books of bank. Has not examined them. It was witness' understanding all the time that he was giving the notes to protect Mr. Shutt from any loss on the C. D.'s and to prevent him from presenting the C. D.'s to bank for payment.

J. J. Gibson lives in Texas; formely lived in Nash; acquainted with plaintiff and also with Mr. Jackson; was president and director of the bank some time before it closed in February, 1923, but moved away to Texas before it closed; was not in actual management of bank after witness moved away; remembers circumstances of its closing in February, 1923. After bank closed witness met Dan Shutt in the bank one morning. He is a brother of J. O. Shutt, plaintiff. There were some negotiations; Jackson, Renshaw, the bank examiner and Mr. Alderson were present. There was present at that time also the letter of plaintiff which witness identifies as being the same spoken of in this testimony.

"Q. Just tell the jury what the arrangement was, in other words, what was said and done at the time there when Shutt and Alderson and you and Jackson were present there? A. At this time we was trying to get the bank's affairs in shape to reorganize, and we was wanting to get as much cash together as we could in order to get in shape to reorganize. Shutt came in with the proposition that if we would give directors' notes he would put some additional funds in the bank and he would accept these notes, in other words, as collateral for his leaving his C. D.'s in there, that there would be no loss in the C. D.'s if the bank reopened, otherwise, if the bank didn't open those was to be void, of no force."

From the letter of plaintiff under date of February 20th it seems to us perfectly clear that plaintiff was making an offer to defendants to accept their two notes for $3,000 in consideration of his surrender to them of his two certificates of deposit for $2,000 each and for sufficient extra cash to make up the full amount of these notes, to wit, $6,000. We draw this conclusion from the statement of plaintiff in his letter:

"For the balance of my deposits in the Bank I am enclosing two notes $3,000 each for the stockholders to jointly sign. * * * Then I will proceed to put enough more money in to cover these $6,000 worth of notes."

And with his letter he sent the two C. D.'s and the exact amount of money neces-

sary to bring the total up to $6,000. That appears in black and white. It is an offer from plaintiff to defendants and so far as this record goes, no one had the right to change it. We further believe that the proof shows an unqualified acceptance of that offer. The defendants accepted the C. D.'s and the necessary cash to make out the $6,000, and that was the last plaintiff ever heard of his C. D.'s or his cash. That was what defendants wanted. They wished to be relieved of the embarrassment of paying these C. D.'s and, so far as this record shows, the C. D.'s were accepted by defendants just as the offer in the letter was made and not a dime thereon was paid thereafter to plaintiff, but, on the other hand, they were stamped "Paid" in the bank of which the defendants were the controlling officers August 10, 1923, showing that defendants dealt with them as plaintiff claims they ought to have dealt with them—as their own. For, if, as defendants claim, these notes were put up as indemnity against loss on these C. D.'s, it is strange beyond belief almost (1) that plaintiff would have yielded possession of his C. D.'s, for, if they were his, the fact that he was not to press immediately, for payment thereof, or that he had additional security therefor, would not have warranted him in simply turning the possession of them over to his debtor; (2) nor if defendants' contention be correct would they have had any authority for having them paid and discharged. So that they accepted the offer as it was intended, it seems to us; they took from plaintiff his money and his securities without giving him a scratch of the pen, or, for that matter, a credit upon their books, or anything to show for his C. D.'s and proceeded to have them paid and canceled without remitting a dollar to owner, if the defendants' theory be correct. On the other hand, if plaintiff's view be correct, every single transaction becomes clear. Plaintiff surrendered up exactly $6,000 worth of property that he never saw the color of thereafter and he received in exchange for this surrender exactly $6,000 worth of notes that he now holds.

The defendants' theory, it seems to us, is wholly fanciful, if not worse. They claim to have surrendered $6,000 worth of solvent, negotiable promissory notes to plaintiff, to whom they personally owed nothing, with the condition that he would simply not press for the payment of his $4,000 C. D.'s. There is nothing in the record that would support the contention that for this enormous payment, which otherwise would not be justi-

fiable, they received any assurance that plaintiff would forbear for a month or for any other specified time.

It is too apparent for reasonable doubt, we think, that defendants were very close run for money; that they were desperately bent on reopening the bank for their own protection, perhaps to save their own property, as it seems they were largely interested in the bank. They were officers of the old bank, likewise officers of the new bank. They wished to get these demands for money which were subject to immediate call, out of the way and in addition they wished other ready money to help them start. With this proposition in writing before them, they saw their opportunity to pay off with notes these matured claims for ready money and to secure additional cash. It was not unreasonable that they should take the step that plaintiff says they did take for that purpose, to wit, to pay off the $4,000 of C. D.'s by their own notes and with additional cash of nearly $2,000 make possible the opening of the institution. These were bankers, president, vice president and cashier of a bank, accustomed to dealing in notes and securities. Their paper writings on their face evidence a transaction which is logical, reasonable and seemingly for the best interests of both parties. We think it would be unwise and unjust upon the kind and quality of testimony introduced in this cause on behalf of defendants who display such an alarming amount of ignorance about the various steps in this transaction, to hold that, after defendants have made use of plaintiff's money and securities and left him without even a record of his holdings in the shape of a receipt or a credit on the books to indicate that he ever paid in cash or held certificates of deposit, the paper writings which they executed in carrying out this plan, which seems to have been simple in its purpose and scope, do not mean what they seem to mean, but that there must be read into the transaction a condition which the papers do not indicate.

We have read carefully this evidence and barring the neglect of defendants, to acquaint themselves and to have information about matters with which they were supposed to be conversant and their consequent lack of knowledge or recollection upon the matters at issue, there is little to warrant the conclusion that the notes herein sued on are not what they purport to be—col'ectible promissory notes. Even assuming that defendants' theory as to the original pur-

pose of the notes was correct, it seems to us very doubtful whether it could now avail defendants. Their theory was that the C. D.'s and the $1,853.50 were simply deposited and remained the property of plaintiff, whereas they have collected and canceled the C. D.'s and spent the money and have left plaintiff without so much as a tangible claim against the defunct bank of which defendants were the active and controlling officers. Again, it might be said that if defendants had any equitable defense, such as a partial failure of consideration as to the notes, or that the same were secured, by misrepresentations, many cases hold that by executing renewal notes they become bound, even with knowledge of the antecedent defect. Bank of Union v. Hungerford, 111 Okla. 225, 239 Pac. 252; Western Silo Co. v. Pruett, 94 Okla. 154, 221 Pac. 106; Farmers State Bank v. Harrington, 98 Okla. 293, 225 Pac. 705; Franklin, etc. Co. v. International Harvester Co., 62 Fla. 185, 57 So. 206.

Since the burden of proof was upon defendants to meet the presumption that immediately arose upon presentation in evidence of the note, the execution of which by the defendants was admitted ,and since such evidence, in our opinion, does not reasonably support the theory of defense, and for the reasons herein set out, we hold that the trial court did not commit error in sustaining a demurrer to the evidence of defendants, and the judgment of the trial court is affirmed.

DIFFENDAFFER, JEFFREY, HERR, and TEEHEE, Commissioners, concur.

Note.—See under (1) 8 C. J. p. 1061, §1373.